MICHAEL PIANIN, ESQ.
Arizona State Bar No. 007557
PIANIN AND ASSOCIATES, P.C.
14300 N. Northsight Blvd., Suite 223
Scottsdale, Arizona  85260
(602) 955-0055
michael@mandplegal.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SEIKALY & STEWART, P.C., a Michigan Professional Corporation, individually, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| STEPHEN FAIRLEY; THE RAINMAKER INSTITUTE LLC; JOHN DOE, jointly and severally, | |
| Defendants. | |

Plaintiff SEIKALY & STEWART, P.C., by its attorneys for its Complaint against Defendants STEPHEN FAIRLEY, THE RAINMAKER INSTITUTE, LLC and John Doe alleges as follows:

**INTRODUCTION**

1. This is a RICO claim, with pendent state claims, alleging violation of 18 U.S.C. §1962(c) and (d) brought by a Michigan law firm against two individuals arising from a bogus internet marketing program, supposedly designed for small law firms and sole practitioners. This program was promoted by Defendant STEPHEN FAIRLEY and assisted by other unnamed individuals.

2. The stated purpose of the marketing programs was to attract potential clients to use Defendant's services and to induce Plaintiff's firm and other similar firms to obtain the same services from the same Defendants ("the Victim Firms"). The RICO scheme was

based in part upon a series of fraudulent representations and misrepresentations about the Defendants' experience and skills in the use of what is known as Search Engine Optimization ("SEO"); and in part on the execution of scheme to perpetrate an ongoing fraud upon various attorneys and small firms after they had purchased the worthless marketing services.

3. As is alleged more specifically below, the Victim Firms were duped into believing that the services to be provided by THE RAINMAKER INSTITUTE, a company owned and/or controlled by Defendant FAIRLEY, would be effective in making the web sites and related web pages of the Victim Firms appear high in the results of the most important internet search engines – most significantly Google – when key terms chosen by the Victim Firms to describe their practices and the services offered were entered in a search by potential clients. Plaintiff and others paid many thousands of dollars, individually and collectively to THE RAINMAKER INSTITUTE to obtain these services, only to find that they were, in most instances completely unsuccessful. THE RAINMAKER INSTITUTE disclaimed all liability for lack of success of its efforts, and this case is not brought for lack of success per se, the lack of success merely being evidence of fraud and damages to business or property. The action is based on the fact that, at the time that the Defendants were promoting this marketing scheme to the Victim Firms, they knew that the techniques they proposed to use were in violation of the guidelines already well-established and published by Google; knew that Google was moving rapidly to crack down on violators; knew that use of these techniques would not only fail to enhance the likelihood that the Victim Firms would rise in Google's rankings but would actually be downgraded to the point where the websites being used by the Victim Firms would become "contaminated" for search engine purposes; knew that they intended to use automated programs rather than direct personal effort to create the appearance that links to the Victim Firms webpages (the key to rising in search engine rankings) were being generated in the numbers represented; and knew that they intended to cloak their schemes in allegations of "trade secrets" to avoid the balance of the scheme from coming to light.

4.     As is further alleged below, the conduct of the Defendants meets the pattern and continuity requirements of the statute, as interpreted, because of the number of victims, the fact that the bogus program was sold to numerous Victim Firms at varying points in time and constitutes not an isolated or incidental feature of the Defendants' businesses but is at the core thereof.  Moreover, the Plaintiff has standing to bring this action by virtue of being a legal person injured in its business or property by, at a minimum, payment of $49,000 in fees for the bogus services.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 (the RICO statute).

6.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendant STEPHEN FAIRLEY is subject to personal jurisdiction in this judicial district and resides in this district. Venue will be proper as to John Doe, irrespective of his location in the United States, pursuant to §1965(b) of RICO, which provides that process may be served in "any judicial district of the United States" when required by the "ends of justice."

## PARTIES

7.     Plaintiff SEIKALY & STEWART, P.C. is a professional corporation engaged in the operation of a law practice in Farmington Hills, Michigan.  As such it is a "person" for purposes of the cause of action provided in §1964(c).

8.     Defendant STEPHEN FAIRLEY is an individual who owns and/or controls a business known as THE RAINMAKER INSTITUTE, LLC.  He is culpable person for purposes of RICO.

9. THE RAINMAKER INSTITUTE, LLC, is an Arizona limited liability company and is, together with defendant Doe, either an enterprise for purposes of the cause of action provided under §1962(c), or forms, with JOHN DOE and STEPHEN FAIRLEY, a de facto association and/or enterprise within the meaning of the statute

10.  The defendant FAIRLEY is employed by or associated with the enterprise.

3

11. The defendant DOE may or may not be directly employed by the enterprise but is a part of it by virtue of his conspiracy with FAIRLEY and the RAINMAKER INSTITUTE and his predicate acts described in this complaint.

12. The enterprise is engaged in, and its activities affect, interstate commerce, in that the defendants present in live seminars all over the country their sales scheme, promoting their services which are tainted by the fraudulent representations and practices described in this complaint. Further, the defendants use the internet, telephones and the U.S. Mail to both promote their scheme but to negotiate contracts for their services and receive payment for them.

13. John Doe is an individual who is a culpable person for purposes of RICO with whom Defendant FAIRLEY conspired to produce the worthless marketing plan and the fraudulent link-building plan summarized in the Introduction and described in greater detail below.

**FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS**

14. For several years prior to the institution of the RICO conspiracy, THE RAINMAKER INSTITUTE, LLC (TRI) and its CEO Defendant FAIRLEY, were engaged in the business of education and training in the marketing of legal services by sole practitioners and small law firms. TRI's Stephen Fairley lectured at various bar associations and in private seminars promoted and conducted by TRI, generating the bulk of its revenue from these efforts and from consulting on a contract basis with various law firms and individual practitioners.

15. Until a year or two prior to 2011, TRI made few attempts to actually sell as a turn-key solution the marketing concepts taught in its training seminars.

16. In 2010 and 2011, Defendant FAIRLEY determined that he could maximize the profits of TRI by selling internet marketing services directly, not merely advice on how clients could do so on their own.

17. John Doe was known to Defendant FAIRLEY as a person skilled in increasing the ranking that lawyers could achieve in major search engines, principally Google, which

4

holds a commanding lead in the search engine industry, such that nearly 80% of all searches on the internet are conducted through Google.

18. The internet is so vast that the process of digesting the content of web pages and matching it with a user's search query, so that the most relevant and worthwhile pages appear in response to the user's request, can only be accomplished through sophisticated computer algorithms. These programs determine the content of web pages through a combination of on-page content and keywords known as metadata that is contained within the source code of the web page that the end-user does not see.

19. However, because the number of web pages that may contain the search terms entered by the user is potentially enormous, additional algorithms are used by Google and others to determine what pages are the most relevant and likely to be of greatest interest to the searcher.

20. The methods used by the search engines are constantly evolving, but for several years preceding the fall of 2011 and continuing to the present, the most basic methodology is that pages are ranked according to the number of other pages that "link" to the page being ranked and, most important for purposes of this case, the quality of the pages linking to the page being ranked. Thus a link from, for example, the New York Times web page (which itself is very highly ranked) will be more effective in boosting another page's rank than a link from a page that has little or no ranking of its own.

21. These principles have been known for more than 4 years, because Google and experts in the field have openly discussed them in readily available publications and internet resources.

22. Even more important for purposes of this case is that Google and others have also specifically warned against the use of various tricks intended to fool Google's systems, including the use of what are known as "link farms", spam pages and other linking schemes.

      a. Link farms are, essentially, software generated pages that link to each other without having any intrinsic value or content;

. . .

5

      b.    Spam pages are web pages used in linking schemes that may be generated manually but are usually generated by automated software methods and that are not created and published to attract legitimate users but to instead fool the search engines into thinking that a page has more popularity than it really does.

23. There has emerged an entire industry devoted to helping vendors of goods and services establish a high profile on the internet so that a user looking for the goods and services through popular search engines will promptly land on that vendor's web site. This industry is known as search engine optimization (SEO).

24. SEO professionals are well aware of the standards, principles and published guidelines concerning legitimate techniques of improving the page rank of web pages. They are also aware of the methods that will either not work at all or will, perhaps, work for a short time until the search engine provider uncovers the technique and cracks down on it.

25. In 2011 and 2012 when the Defendants were promoting their link building schemes, SEO professionals knew that link farms, linking to and through spam pages and other automated link generation schemes violated Google's policy and guidelines and were, increasingly, proving ineffective at improving page ranks.

26. During 2010 and 2011 Defendant FAIRLEY, in the course of operating TRI, repeatedly spoke at seminars that he marketed as "Rainmaker Retreats" in various locations in the country, promoting the abilities of TRI to create blogs (a particular kind of website) and draw website traffic to them through the process of link building.

27. Plaintiff, through one of its attorneys, attended one such seminar in Orlando, Florida on July 22-23, 2011.

28. At that seminar Defendant FAIRLEY spent significant portions of the two days promoting the ability of TRI to establish a web presence for its clients through the creation of the aforementioned blogs and the process of building links on the Internet to those blogs that would be recognized by Google and other search engines. An attorney from Florida who had allegedly been highly successful in raising the rankings of his own webpages and pages used by firms with which he was associated appeared with Defendant FAIRLEY

6

and, as part of the promotional scheme, purported to analyze existing websites for participants at the seminar to demonstrate that their page rankings were low, and needed improvement through the techniques available from TRI.

29. The schedule of "Rainmaker Retreats" of the type of held on July 22-23rd of 2011, and the fact that program materials that were republished appeared not to be specific to that event but rather of a standardized type that could be used at any like seminar demonstrates this was not an isolated event, and of the representations and sales approach being used at the seminar attended by Plaintiff were part of a pattern of activity.

30. Between the conclusion of the seminar and September of 2011 Plaintiff and Defendant entered two contracts that would provide services by the Defendant for the benefit of the Plaintiff for the sum total of $45,000.

    a. The first contract was entitled THE RAINMAKER INSTITUTE BLOG WRITING AND SOCIAL MEDIA AGREEMENT Form G;

    b. The second contract was entitled THE RAINMAKER INSTITUTE LINK BUILDING 1 YEAR AGREEMENT.

31. Defendants FAIRLEY and THE RAINMAKER INSTITUTE also knew that they were to be providing link building for three separate domain names operated by the Plaintiff: seikalystewart.com, protectyourstudent.com and oaklandbusinesslawyers.com.

32. The forms of these agreements demonstrate that the contracts with Plaintiff were not unique and were instead used with a variety of lawyers and law firms to work the same scheme upon them that was worked on the Plaintiff.

33. Upon information and belief and subject to further discovery, Defendant FAIRLEY intended that the link-building components of the service, and perhaps more, be subcontracted to other individuals, including , but not limited to John Doe.

34. It further appears, based on expert analysis performed prior to the filing of this case that:

    a. Links were generated by automated processes that may have generated a large number of links, but not of a quality nature;

. . .

      b.    Notwithstanding the use of automated techniques capable of generating links without a great deal of effort, the number of links generated was well under that which was contracted for;

      c.    Defendant FAIRLEY, in furtherance of the pattern of illegal and fraudulent acts, claimed that over 50,000 links had been generated during the contract period, when in fact far fewer appear to have ever been generated;

      d.    Defendant FAIRLEY, perhaps in conjunction with John Doe, claimed that the process of building links, including where the links were to be found, was a trade secret; and that he therefore was not required to reveal what he had actually done to fulfill the contract.

35. The link building contract between the Plaintiff and TRI provided that no fewer than 2000 inbound links to the client to webpages would be provided each month. Implicit in the contract was that the links it would be of value and not worthless links of the kind that is specifically disallowed and/or disregarded by the major search engines, especially Google.

36. Expert analysis performed since the conclusion of the contract has shown that essentially no links were created for protectyourstudent.com and seikalystewart.com. Approximately 6720 links appear to have been created for Oaklandbusinesslawyers.com, but all the links with the exception of approximately 188 links, were worthless links built with link farming techniques and, in many cases, were not forwarding to the Plaintiff's webpages at all.

37. In approximately April 2012, Google stepped up enforcement of its policies against link building schemes, in part through the implementation of new programs and algorithms collectively known as the "Penguin" update.

38. The Penguin update made it even less likely that the link building schemes being utilized by the Defendants and THE RAINMAKER INSTITUTE would be of any value to its clients.

39. Upon information and belief, it quickly became even more apparent to the Defendants that their schemes would have no positive effect and might have a detrimental effect on the webpages in domain names owned by the Victim Firms; however, Defendants . . .

8

continued to take money for their worthless services, without disclosing that it knew that the alleged services would be of no value.

40. Upon information and belief, even after it became evident that Defendants' methods were not capable of achieving the results that had been represented to the Victim Firms and that, in fact, web page rankings were not being achieved as represented, Defendants continued to market their services in much the same way and continued to withhold from existing victims the fact that the services for which the Defendants were being paid were worthless.

41. The continued marketing by the Defendants of internet marketing services that the Defendants knew were worthless and knew were based on misleading representations to unsuspecting clients, misled the clients into believing that the sheer number of links created would yield positive optimization results. This conduct represents a pattern of activity in violation of the RICO statutes.

42. Wholly apart from link-building but in furtherance of the RICO conspiracy, Defendant FAIRLEY through THE RAINMAKER INSTITUTE, engaged in an ongoing fraud upon the Victim Firms by selling the same supposedly "unique" blog content for posting on the firms' web pages to several firms at the same time.

    a. **Example Number 1:** As of April 14, 2013, entering into Google the sentence "In mediation, a neutral mediator assists the parties in reaching a mutually acceptable resolution to their dispute." leads to two different attorney websites: Robert Chelle, a health care lawyer in Arizona, and Amiel Wade, of the Wade Law Group in San Jose California.

        i. The article containing this sentence was first delivered to Plaintiff on November 26, 2011 by Defendant FAIRLEY's Rainmaker Institute. (Exhibit 1) It was published on February 26, 2012 on Plaintiff's oaklandbusinesslawyers.com website (Exhibit 2)

        ii. Meanwhile, it had been published on Mr. Chelle's site on January 30, 2012 (Exhibit 3) and was published again on August 23, 2012 on the site of the Wade Law Group (Exhibit 4)

        iii. The format of all three sites is so similar as to make it very likely that both Mr. Chelle and the Wade Law Group are also clients of THE RAINMAKER INSTITUTE.

9

      b.    **Example Number 2:** As of April 14, 2013, entering into Google the sentence "All business partnerships start with the best intentions, but many do not end that way." leads to two different attorney websites: The Wade Law Group in California and the Gierach Law Firm in Illinois.

           i.    The same content was initially delivered to Plaintiff for editing on December 5, 2011 (Exhibit 5);

           ii.    It was published on March 2, 2012 on Plaintiff's oaklandbusinesslawyers.com website (Exhibit 6)

           iii.    Meanwhile, it had been published on February 17, 2012 on the Wade Law Group site (Exhibit 7), and was published again on September 5, 2012 on the site of the Gierach Law Firm (Exhibit 8)

43. At no time was the Plaintiff aware that content which was supposedly being written for the exclusive use of Plaintiff was being provided to and published by other law firms.

44. Upon information and belief and subject to further discovery, none of the other firms that were publishing this duplicative content was aware of the fact that it had already been sold to at least one other law firm.

45. The ongoing practice of selling the same supposedly unique blog content to multiple parties contributed to the open end pattern of violations and predicate acts.

46. TRI approached Plaintiff toward the end of the contract year and persuaded Plaintiff to extend the agreement for an additional 6 months. In doing so, neither Defendant FAIRLEY nor anyone else associated with TRI explained what had really happened, claiming instead that it was unforeseen changes in Google's policies and a lack of follow up by TRI (not the fraud that had been worked on Plaintiff and the Victim Firms) that had let the failure of the marketing program to demonstrate any improvement. It was stated by a representative of TRI that TRI wanted to "make right" on the fact that the program had not been successful and that further analysis had shown that the web page to which the blog sites and some of the links themselves directed the person looking for legal services was not effectively designed and needed reworking, which TRI would do largely at its expense.

47. Based on these representations and without knowing of the fraudulent schemes that has been perpetrated by the Defendants, Plaintiff agreed to the 6-month extension.

48. Only after approximately two months of the 6 month extension did Plaintiff begin to learn the truth and ceased dealing with TRI and FAIRLEY, except in an attempt to amicably resolve this dispute.

**COUNT I – CAUSES OF ACTION UNDER RICO §1961**

49. Plaintiff reincorporates the foregoing allegations of the complaint as though fully restated herein.

50. The Defendants agreed to and did conduct and participate in the conduct of the TRI's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff, all as set forth in the specific factual allegations set out above.

51. The foregoing facts demonstrate violations of §1961(1).

52. All of the predicate acts described herein have been and continue to be conducted by means of the internet, through email, web sites and blog sites and were thus accomplished by means of "wires".

53. Pursuant to and in furtherance of their fraudulent scheme, defendants committed multiple related acts as set forth above.

54. The acts of the Defendants further meet the RICO requirements of mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively, in that the above-described acts:

    a. constitute a plan or scheme to defraud;

    b. with intent to defraud;

    c. together with knowledge that the mail or wires will be used, and

    d. involved actual use of the mail or wires to further the scheme.

55. The acts of the Defendants constitute a pattern of racketing activity within the meaning of 18 U.S.C. § 1961(5), because:

      a.      the conduct has continued over a long enough period of time to provide the requisite continuity for a closed-end pattern; and,

      b.      Defendant's racketeering acts have been ongoing for almost 2 years and continue to be an integral part of the Defendants' business. As such, the acts "…themselves include a specific threat of repetition extending indefinitely into the future [or] ... are part of an ongoing entity's regular way of doing business…" within the meaning of *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). As such these acts provide the requisite continuity for an open-end pattern.

56. The acts of the Defendants were intended to and do in fact affect interstate commerce.

57. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property by reason not only of the lost opportunity to pursue other marketing efforts, but the direct loss of $49,000 directly paid to THE RAINMAKER INSTITUTE.

WHEREFORE, Plaintiff claims actual damages, in an amount to which it is found to be entitled, treble damages, actual attorneys fees and expenses of suit.

## COUNT II - CAUSES OF ACTION UNDER RICO §1962(d)

58. Plaintiff reincorporates the foregoing allegations of the complaint as though fully restated herein.

59. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, the Defendants, in the manner set forth in the Common Allegations worked together to design, promote and cover up the link-building scheme, and in so doing conducted and participated in the conduct of the affairs of the enterprise through the pattern of racketeering activity described in the Common Allegations and Count I.

60. As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Plaintiff has lost $49,000 in payments directly made to THE RAINMAKER INSTITUTE and has further been diverted from pursuing more potentially effective marketing efforts by Plaintiff's reliance on the Defendants.

WHEREFORE, Plaintiff claims actual damages, in an amount to which it is found to be entitled, treble damages, actual attorneys fees and expenses of suit.

## COUNT III - STATE LAW CLAIMS

61. Plaintiff reincorporates the foregoing allegations of the complaint as though fully restated herein.

62. The conduct of the Defendants constitutes common law fraud in that:
    a. the representations made by the Defendant and the schemes carried out by them were intended to be relied upon by the Plaintiff;
    b. the representations were false and misleading;
    c. Plaintiff reasonably relied upon them;
    d. Plaintiff has been damaged in the way set forth in the Common Allegations.

WHEREFORE Plaintiff claims damages against the Defendants in an amount to which he is found to be entitled, together with costs, interest and attorneys fees.

WHEREFORE Plaintiff claims punitive damages against the Defendants in an amount as determined by the trier of fact.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 24th day of July, 2013.

PIANIN AND ASSOCIATES, P.C.

/s/ Michael Pianin

MICHAEL PIANIN, ESQ.
14300 N. Northsight Blvd., Suite 223
Scottsdale, Arizona 85260
*Attorneys for Plaintiff*